ROBERTSON, Justice,
concurring:
I concur in the result we reach and in the judgment wé affirm. I write separately because I think common sense and common law demand a more formalistic focus upon the depository bank’s duties when served with a writ of garnishment. No doubt garnisheed joint accounts are troublesome. I think the obligations of the bank so served are measured by its contract with its depositor(s). The bank is obliged the same as when a holder presents a check drawn by the judgment debtor.
First, a few basics. Garnishment is a right and a process grounded in statute. Miss.Code Ann. § 11-35-23 (1972) provides, with certain exceptions not relevant here, that a judgment debtor may cause a writ of garnishment to be served upon a third person and thereby bind
[a]ll property in the hands of the garnishee belonging to the defendant at the time of the service of the writ_
The garnishment binds as well after acquired property, that is, judgment debtor’s property coming into the garnishee’s hands after service of the writ and until the writ be finally dissolved, and Miss.Code Ann. § ll-35-25(l)(b) (Supp.1987) requires the garnishee to answer and identify all property of the defendant he held at the time the writ was served or “has had since, in his possession or under his control[.]”
It is common to think of the writ reaching only the defendant’s property, but no one has ever thought its power limited to seizure only of that in which the defendant held an unfettered title. It is enough that the garnishee is answerable upon defendant’s demand for the property and the statutory “belonging to the defendant” does not mean much more. And so we find Cupit v. Brooks, 237 Miss. 61, 112 So.2d 813 (1959), holding a writ of garnishment, served on a bank holding a deposit in a joint account, sufficient to seize the deposit, even though the evidence showed that vis-á-vis his co-account holder the judgment debtor/joint account holder may not have owned the funds.
We are concerned here with a garden variety joint checking account. Arie Washington and William E. (Bill) Jones, Jr. were each authorized to draw checks on this account. Not one word before us suggests Deposit Guaranty National Bank had any authority to dishonor a check Jones may have drawn on grounds other than *184 (un)availability of funds.[1] Without question, the Bank’s construction loan to the Washingtons was the source of funds. I do not doubt for a minute the Washingtons had a substantial ownership interest in advances the Bank made and deposited in the account, nor do I doubt that on these facts Jones may be liable in an action for conversion. By the same token, the law afforded the Washingtons more than one pre-gar-nishment facility adequate to protect their funds. The Washingtons could have limited the Bank’s authority to honor Jones’ checks. They could have contracted with the Bank and Jones so that the Bank would have had no authority to honor any check not directed toward some purchase or expense incident to the construction. A co-signature requirement may have been a more practicable expedient. The Washing-tons did nothing and may not complain now.
The view I take is well put by the Supreme Court of Minnesota in Park Enterprises, Inc. v. Track, 233 Minn. 467, 47 N.W.2d 194 (1951), from which I quote extensively.
By the deposit agreement here involved, each depositor has given the other depositor in the account complete and absolute authority over it and unconditional power to withdraw all or any part of the account. By the terms of the agreement, the bank is likewise obliged to pay any part or all of the account to either depositor upon demand.
Since in purpose and legal effect a garnishment proceeding is virtually an action brought by defendant in plaintiff’s name against the garnishee, resulting in the subrogation of the plaintiff to the right of the defendant against the garnishee, we have concluded that plaintiff here may not only garnishee this joint account, but also that it would be entitled to recover judgment against the garnishee for the entire amount of the account if its judgment against defendant were sufficient to exhaust it. Defendant is entitled to withdraw any part or all of the account, and plaintiff, in effect, is subrogated to that right.
Park Enterprises, 233 Minn, at 470, 47 N.W.2d at 196. The Court discussed Empire Fertilizers Ltd. v. Cioci [1934] 4 D.L.R. 804, a Canadian case to like effect, then resumed:
Intervener [Washington], having agreed to allow defendant [Jones] to treat the funds in their joint account as his individual property, is in no position to assert that creditors [the Petes], subrogated to his rights, may not treat them as if they were his individual property. Intervener assumed the risk that defendant would pay these creditors voluntarily, and we fail to see why an involuntary payment stands upon a different footing. If inter-vener assumed the risk that her husband would voluntarily honor his debts out of this account, we see no meritorious reason why she should be legally entitled to eschew the risk that he will be compelled to do so. The law should not hedge intervener’s risk at the exact instant when the degree of her risk rests upon a point of honor. We shall not assume that intervener took the risk that her husband would honor his debts out of this account merely because she thought he could not be compelled to do so.
The peculiar features of a joint bank account, such as this case presents, make it difficult, if not impossible, in most cases, to determine what portion of the account belongs to each depositor. A long series of deposits which cannot be traced to their source, and a similar series of withdrawals which cannot be traced to their destination, are normally involved. This defect is inherent in the severalty feature of such bank accounts wherein each depositor is allowed to treat joint property as if it were entirely his own. Like any loose system of dealing with money, joint bank accounts sacrifice precision to convenience and becloud the respective rights of the depositors. The courts should not encourage *185 parties to do their bookkeeping in court when, by their private contrac-,, they have virtually declared that they do not wish to be inconvenienced by any strict accountability as between themselves. A joint bank account of this kind is a creature of contract between parties avowedly indifferent to the exact percentage of ownership between themselves. The law should take them at their word and give effect to their contract without making detailed and belated evidentiary inquiries to establish factual ownership. Any presumption, whether conclusive or rebut-table, that part or all of these joint accounts are immune from garnishment has the effect of either creating or tending to create a nonstatutory exemption for the parties using them, and any attempt to base the extent of garnishment upon the respective amounts of the account owned by each depositor will compel courts and juries to grope with problems which the depositors themselves have declared to be of no consequence. Let them abide the results which flow from their own declared purposes.
Park Enterprises, 233 Minn, at 470-72, 47 N.W.2d at 196-97.
Cupit v. Brooks, supra, cited by the majority, is wholly consistent with these principles. Delta Fertilizer v. Weaver, 547 So.2d 800 (Miss.1989), fuzzies things up, and without profit, but this is nothing new. See Staley v. Brown, 251 Miss. 316, 169 So.2d 475 (1964); Collins v. General Electric Company, 239 Miss. 825, 123 So.2d 609 (1960).
Hypothesize that in early April, 1987, Jones drew a check payable to Joseph L. and Mary Pete for $8,322.25, or for whatever sum. The Washingtons had no legal power to prevent the Bank’s honoring such a check. I know of no legally defensible premise upon which the Bank may have refused to pay such a check, save only availability of funds in the account (and, of course, the Bank’s obligation to the Wash-ingtons to advance funds to the account). Of course, Jones will have robbed Peter to pay Paul (or more precisely, Arie to pay Joseph), but I know of no view on which Paul’s and Joseph’s equities might be thought less than Peter’s and Arie’s. If anything, they are greater, for Arie neglected, if not ignored, pre-garnishment facilities that likely would have prevented his loss.
When the Petes had the Bank served with the writ of garnishment on March 10, the Bank’s obligation was to examine its books, records, and accounts to see if it held any assets belonging to Jones. When it ascertained that indeed it held funds in a joint account payable upon the order of either Washington or Jones, the Bank was legally obligated to withhold any disbursements therefrom without court approval. This obligation continued as to funds which came into the account after March 10 and until such time as the court ordered the lien of the writ of garnishment dissolved. Ironically, on March 10, the Washington-Jones account showed a balance of a mere $46.58. On that date the Sheriff served the writ of garnishment on the Bank, and over the course of the next month, for reasons I cannot fathom, the Bank proceeded to advance and deposit into the account some $16,994.75, during which time Jones drew some forty-three checks. Nothing before us suggests that the Bank inquired whether Jones or Washington “owned” the funds before honoring any of the forty-three checks, nor does the Bank suggest any basis upon which it may have had the legal right to inquire regarding ownership.
Because the Bank held funds subject to Jones’ order, and not because Jones “owned” the funds, I would affirm. I think it likely the Petes were entitled to more than $8,322.25 on their garnishment action against the Bank, but they make no cross-appeal to that effect.
Of course, in a matter such as this, if the Bank, upon receipt and service of a writ of garnishment, is in doubt, our law provides an adequate procedural remedy. All the Bank has to do is interplead the funds into the Court, have process served on all concerned, and retire from the scene. Miss. Code Ann. § 11-35-43 (1972); Rules 22 and 81(a), Miss.R.Civ.P.

. Curiously, neither party saw fit to place the joint account agreement with the bank into the record.